Page W. ACREE, Elizabeth Smith Acree, William Smith Acree, and Kathy Sartori Acree

v.

SHELL OIL COMPANY, Shell Chemical, Inc., and ABC Pipeline Construction Company.

Civ. A. No. 79–41–B.

United States District Court, M.D. Louisiana.

Oct. 7, 1982.

Russell L. Dornier, Leon Gary, Jr., Gary & Field, Baton Rouge, La., for plaintiffs.

Alvin B. Gibson, New Orleans, La., Tom F. Phillips, John W. Barton, Jr., Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendants, Shell Oil Co. and Shell Chemical, Inc.

POLOZOLA, District Judge:

This case is before the Court for a determination of whether the defendants have a contractual right under the terms of an oil and gas lease to lay a pipeline across plaintiffs' property.

The plaintiffs, Page W. Acree, Elizabeth Smith Acree, William Smith Acree, and Kathy Sartori Acree (Acrees) filed this suit against Shell Oil Company (Shell), Shell Chemical Company (Shell), and an unknown pipeline company. Plaintiffs contend that they have been damaged due to a trespass of their property by the defendants who came upon plaintiffs' property, over plaintiffs' objection, and excavated a trench for the purposes of installing a pipeline to be used in the transportation of gas and other petroleum products. Shell argues that it has a right to lay the pipeline across plain-

tiffs' property under the terms of an oil and gas lease it has with the plaintiffs and others.

The parties have submitted this case to the Court on a stipulation of facts. The Court has also ordered that the present trial be limited to the rights and liabilities of the parties under the lease agreement and has severed the remaining issues in the case. The joint stipulation of facts filed in the record provides:

## "JOINT STIPULATION OF FACTS

"Plaintiffs and defendant, through undersigned counsel, submit the following joint stipulation of facts upon which decision in this case may be had, viz:

"A. The plaintiffs are the owners and possessors of the property described in paragraph 3 of the complaint, having acquired the same by separate acts of cash sale dated July 21, 1977, and partition dated August 25, 1977—which instruments are attached as Exhibit 1.

"B. At the time plaintiffs purchased the described property, defendant, Shell Oil Company, had obtained and filed for record 52 oil, gas and mineral leases enumerated in paragraph 12 of the answer filed by Shell, which leases were obtained from the same owners in indivision of the same property which was subsequently conveyed to plaintiffs, and the lease agreement attached as Exhibit 2 is a photocopy of an unexecuted lease form utilized by the parties except as stated in the next paragraph of this stipulation, and all 52 leases have been maintained in force and effect at all times pertinent hereto.

"C. That the provisions of the 52 leases are identical except for those differences noted by Shell in paragraphs 13 and 14 of its answer filed herein, which paragraphs for convenience of the Court are attached as Exhibit 3. One lease which contained different language was from Tulane Educational Fund which had an interest in the property of approximately forty-five per cent (45%).

"D. That during or prior to January of 1978, Shell Oil Company representatives contacted plaintiff, Smith Acree, concerning acquisition of surface rights in addition to those contained in the mineral leases then held by Shell.

"E. That plaintiffs refused the offers made by representatives of Shell and advised Shell that legal proceedings would be instituted if any construction activity were undertaken on the property.

"F. That Louisiana Intrastate Gas Corporation under a nonexclusive grant from Shell and for the mutual benefits to be derived from the pipeline by Shell and Louisiana Intrastate Gas Corporation, as well as all persons having interests in the production of oil, gas and other minerals from the leased premises or land pooled therewith, and relying on the representations of Shell as to surface rights across plaintiffs' property, went onto plaintiffs' property and constructed a pipeline for the transportation of minerals from a well designated as Turner No. 1, situated in Section 20, Township 3 South, Range 6 East, and within the limits of a Commissioner-of-Conservation-created unit, the center line of which pipeline traverses the eastern portion of the East one-half (E ½) of the Northwest Quarter of Section 17, T–3–S, R–6–E, and through the eastern portion of the Southeast Quarter of the Southwest Quarter (SE ¼ of SW ¼), Section 8, T–3–S, R–6–E, all on plaintiffs' property. The approximate location of the pipeline through plaintiffs' property is shown on the plat attached hereto as Exhibit 4. It is necessary for the oil and gas produced in the field to be transported from the premises for sale and/or use in commercial quantities.

"G. That pursuant to order No. 1029–A of the Office of Conservation of the State of Louisiana, three drilling and production units for the 16600 Tuscaloosa Sand, Reservoir B, in the Moncrief Field, St. Landry Parish, Louisiana, were created. Those units are shown on Exhibit 4, and the units designated as 16600 TUSC RB SU A and TUSC RB SU B contain a portion of plaintiffs' property. None of

plaintiffs' property in Section 8, T–3–S, R–6–E, through which a portion of the pipe line runs, is included in any of the three units. No portion of plaintiffs' property is situated in the unit designated as TUSC RB SU C.

"H. Initially the pipeline moved gas produced by the well designated as Turner No. 1, which was drilled in Commissioner's unit designated as RB SU A, and in March, 1979, production from the well known as Myers No. 1, situated in the unit designated RB SU B, was transported in a field line constructed by Shell to the LIG pipeline through which it was transported for commercial use. In May, 1981, the well designated as Turner No. 3, situated in the Commissioner's unit designated RB SU C, was placed in production, and the gas produced from that well was transported through field lines constructed by Shell to a collecting point at or near the Turner No. 1 well location, and such production is at that point injected into the LIG pipeline for transportation and commercial utilization. The Turner No. 1 well was plugged and abandoned in October, 1980.

"I. The ownership of property in the area is as shown on attached Exhibit 4.

"J. That the lease agreement attached as Exhibit 2 contains the language of the leases enumerated as Nos. 2 through 52 in Shell's answer at paragraph 12. The names and signatures of the lessees are shown on the original recorded leases although they are not shown on the specimen lease, Exhibit 2."

The relevant portion of the lease agreements provides:

"Lessor, in consideration of the sum of ONE THOUSAND DOLLARS AND OTHER VALUABLE CONSIDERATION ($1000.00 ovc), hereby leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession, storage and

transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads, pipelines and/or canals thereon for operations hereunder <u>or in connection with similar operations on adjoining land,</u> and including the right to remove from the land any property placed by Lessee thereon and to draw and remove casing from wells drilled by Lessee on said land, the land to which this lease applies and which is affected hereby being situated in St. Landry Parish, Louisiana, and described as follows, to-wit:"

The underscored language, "or in connection with similar operations on adjoining land" was deleted from fifty-one leases and was only contained in the Tulane lease.

■ It is well settled that the intention of the parties to a contract must be determined in accordance with the plain, ordinary and popular sense of the language used in the agreement. *Texaco, Inc. v. Vermillion Parish School Board,* 244 La. 408, 152 So.2d 541 (1963).

Plaintiffs argue that the pipeline constitutes a trespass because it does not transport minerals produced upon the leased acreage or upon "acreage pooled therewith." Plaintiffs also contend that the language contained in the Tulane lease is not binding on them, but even if they are bound by this language, the Turner No. 3 well is not on "adjoining land." Thus, plaintiffs contend that in order for Shell to use the surface of plaintiff's land for the transportation of minerals produced on the leased property or "acreage pooled therewith," the entire tract must be pooled with the other acreage. The Acrees cite other examples in the lease where the additional language "or any part thereof" is used to define Shell's right to use leased property. According to the Acrees, if their interpretation of the lease is incorrect, there would be no need for the language "or any part thereof" in

the lease. Finally, the Acrees argue in the alternative, that the use of their land for pipelines should be limited to that portion of the land which is pooled with the adjoining land containing the well site.

After carefully reviewing this very complex and difficult case, the Court finds that the meaning which must be given to the phrase "or acreage pooled therewith" is that if any acreage within the lease is unitized with a producing well, the surface of the leased tract may be used to transport production from the unit well. The Court further finds that Tulane granted Shell a valid lease and, thus, made Shell the owner of an absolute right. Finally, the Court finds that property which touches at a corner is "adjoining property" as that term is used in the lease. Each of these findings will be discussed separately.

■ The Court's interpretation of the clause, "acreage pooled therewith" is supported by the manner in which virtually identical language is used in the Louisiana Mineral Code (L.S.A.–R.S. 31:1 et seq.). Article 114 of the Mineral Code provides that a mineral lease will be kept alive in its entirety by operations on "the land burdened by the lease or land unitized therewith." The comment following Article 114 indicates that the article was intended to codify the rule of *Hunter v. Shell Oil Co.,* 211 La. 893, 31 So.2d 10 (La.1947), and *LeBlanc v. Danciger Oil & Refining Co.,* 218 La. 462, 49 So.2d 855 (1950), which held that off-premises production from a unit which included part of the leased premises kept the lease alive on the non-unitized portion of the same tract. When the Mineral Code was enacted, the Legislature did not feel it necessary to include the words "or any part thereof" to achieve this result.

The fact that the phrase "or any part thereof" was included in other parts of the fifty-two leases involved in this case does not change the clear meaning of the language in the granting clause. The use of greater detail to describe the identical concept does not alter the unambiguous expression of intent. This conclusion is supported by an interpretation given by the United States District Court for the Western District of Louisiana to a lease involved in *Broussard v. Amerada Petroleum Corp.,* 350 F.Supp. 104 (W.D.La.1972).

In *Broussard,* supra, the lease provided that it would be maintained by production on either "the leased premises or on lands pooled therewith . . ." There the leased acreage was divided between four Commissioner of Conservation-created units. The issue presented to the Court in *Broussard* was whether off-premises production from three of the units kept alive that part of the lease within the fourth unit. The Court answered this question in the affirmative even though in another portion of the lease, the parties agreed to more specific language which provided that operations within a lessee-declared unit would preserve the lease "as to all of the land covered hereby (*including any portion of said land not included in said unit.*" (Emphasis supplied.) The inclusion of the underscored language in the second provision did not act to restrict the application of the first provision, where it was omitted. In fact, the *Broussard* court *relied* upon the second provision in deciding that the first provision was intended to have the same breadth of application.

It is also clear that a contract "must be viewed as a whole and the intention of the parties must be gathered from all its parts, to the end of giving practical effect to the instrument in the way intended." *Long-Bell Petroleum Co. v. Tritico,* 216 La. 426, 43 So.2d 782, 792 (1949). Shell's leases provide in paragraph 3 that:

"In the event of the forfeiture of this lease for any cause, Lessee shall have the right to retain around each well then producing oil, gas or other minerals or being worked on the number of acres fixed and located by or in accordance with the spacing or unit or proration allowable order of any Regulatory Body of the State of Louisiana or of the United States under which said well is drilled or produced, or if said well has been or is being drilled or a unit pooled by Lessee as provided herein, the Lessee may retain all

of the acreage comprising said pooled unit . . . Lessee shall have such rights of way or servitudes affecting the acreage released or forfeited as are necessary for Lessee's operations on the land retained hereunder."

The above paragraph provides that even though only part of the lease is retained by virtue of production from a unit, the lessee may exercise rights of way over the nonunitized portion of the lease which may be necessary for its operations on the unitized part. The plaintiffs contend that the granting clause precludes the exercise of rights of way over nonunitized portions of the lease to accommodate off-premises production on the unitized area. This construction would put the two paragraphs in direct conflict. The Court believes after considering the lease agreement as a whole the lease agreement means that the entire surface of the leased tract may be used for the transportation of minerals produced on a unit which includes any part of the lease.

The Court further finds that Shell has the right to transport gas from the Turner No. 1 and Myers No. 1 wells across plaintiffs' property under the terms of this lease. In addition, Shell has the right to use plaintiffs' property to transport gas from Turner No. 3 because of the clause in the Tulane lease. Plaintiffs strenuously contest Shell's right to use the Tulane lease. Thus, it is necessary for the Court to determine the applicability of the after-acquired title doctrine. Article 144 of the Louisiana Mineral Code states:

"A mineral lease may provide that a mineral right that terminates during the existence of the lease and becomes owned by the lessor or his successor in title shall be subject to the lease. If the lease is filed for registry, the provision is binding on all subsequent owners of the land or mineral rights leased."

Article 144 codifies prior law which recognized that an after-acquired title clause of the type described binds the lessor who agreed to it. Previously, however, such a clause did not bind a lessor's successor because the after-acquired title obligation was deemed to be "personal" to the lessor. In order for the obligation to affect a successor, the obligation had to be expressly assumed. *Calhoun v. Gulf Refining Co.*, 235 La. 494, 104 So.2d 547 (1958).

Article 144 changes the jurisprudential rule with respect to outstanding mineral rights which terminate during the existence of the lease. Under the pre-code decisions, it was virtually impossible to obtain a secure lease when mineral servitude rights were outstanding and about to expire. The servitude owner was unable to give secure title and the landowner would generally refuse to give a joint lease since that would extend the life of the servitude. Thus, it was necessary to remedy this situation by allowing the lessee to bind the lessor's successor to the lease when the outstanding mineral rights reverted to him. L.S.A.– *Min.Code* art. 144 *Comment.*

■ Shell argues that Article 144 is controlling in this case because the Tulane lease has an after-acquired title clause purporting to bind the lessor's successors. However, this article was not intended to apply to co-owners. Article 144 anticipates the existence of outstanding mineral rights unowned by a landowner-lessor which subsequently terminate in his favor. In this case, the interests of the original lessors have not "terminated" under Article 144. Shell acquired its lease from a co-owner of all the land and minerals and not from the owner of land from which the mineral interests had been sold. The Acrees are purchasers of the land, not successors of the mineral lessor to whom a previously severed interest has reverted through the effect of prescription. Obviously, Shell was never faced with the dilemma which Article 144 remedies. Thus, Article 144 is not controlling under the facts of this case.

Furthermore, the Acrees' argument that the last sentence of Article 145 of the Louisiana Mineral Code prevents the Tulane lease from binding them must also fail. Article 145 provides:

"If, in the absence of an express provision of the kind contemplated by the preceding Article, a party purports to grant a

mineral lease on land or mineral rights that he does not own, any title thereto he subsequently acquires inures to the benefit of the lessee. Successors in title of the original lessor are not bound under this Article unless they agree expressly and in writing to become so bound."

 Article 145 must be read together with Article 144. It appears that Article 145 governs where Article 144 would apply except for the absence from the lease of a clause binding the lessor's successors. The comment following Article 145 codifies the general principles of the court-created after-acquired title doctrine. This doctrine provides that although the sale of another's property is null, the purchaser is entitled to the benefit of any title subsequently acquired by the seller. LCC Article 2452. However, unless he expressly agrees to it, a successor to the seller may not be forced to deliver such an after-acquired interest. *McDonald v. Richard,* 203 La. 155, 13 So.2d 712, 714–715 (1943). Application of the doctrine to leases is justified because Article 120 of the Louisiana Mineral Code makes the implied warranty of a mineral lessor the same as an implied warranty made by a vendor. See the Comment following Article 145 of the Louisiana Mineral Code.

 It does not appear that the Mineral Code expressly addresses the situation *sub judice.* Articles 144 and 145 are conceptually inapposite. However, the articles of the Mineral Code may provide for a result where none is expressly mandated by its provisions. Article 2, Louisiana Mineral Code. The Court believes that Article 187 of the Mineral Code should control this case although the facts do not bring the case within the literal words of the article.

Article 187 is placed in Chapter 10 of the Mineral Code dealing with "Co-ownership." It provides that:

"If the whole of the land is adjudicated to the party who created a mineral right or to his successor, the right is not extinguished or otherwise affected and the mineral right owner has no interest in the proceeds of the sale. In such cases, the party to whom the land is adjudicated is entitled to a credit on the total purchase price equal to the proportionate value of the mineral right or interest therein."

A discussion of Article 187 is found in the comment to Article 179. This comment provides that "if the whole of the land is adjudicated to one who created a mineral right or to his successor or assign, it is only logical to require that he remain bound by the interest he created or to which his interest was subject when he took title." The rationale of this requirement is just as compelling here, where the successor acquired the whole of the affected land by way of a voluntary partition and sale, as it is where the land is adjudicated to him.

The arrangement of the Mineral Code demonstrates that co-ownership is a conceptually unique regime with special considerations. Thus, Article 187 was enacted to apply in those cases where the applicability or non-applicability of the after-acquired title doctrine might otherwise be expected to control. The rights of a co-owner affect every particle of the land, since it is the right of ownership, not the thing itself which is divided among the co-owners. Planiol, *Traité élémentaire de droit civil,* Vol. 1 Part 2, p. 473 (Louisiana Law Institute Translation 1959). The co-owner is not leasing that which he does not own.

 A mineral lease from a co-owner does not create a mere personal obligation in the "lessor" to deliver an interest in land should the lessor ever acquire title to it. Such a lease confers a valid mineral right. L.S.A.–*Min.Code* art. 166. The exercise of the right is merely suspended pending the consent of the other co-owners. See, *Comment* following Article 166. Furthermore, the mineral lessee is a necessary party to any action for partition, and if he is not joined in the action his rights cannot be affected by a judgment rendered therein. Article 179 of Louisiana Mineral Code. Thus, as the comments to the Mineral Code recognize, it is only logical that the successor to the co-owner who granted this right should have to recognize it.

If the right granted by Tulane is treated as a servitude under the Civil Code, the result is not changed. The rule pertaining to mineral rights appears to coincide with that applied to conventional servitudes and is based upon the same reasoning. Article 719 of the Louisiana Civil Code states:

"Except as provided in Article 718, the successor of the coowner who has consented to the establishment of a predial servitude, whether on the entire estate owned in indivision or on his undivided part only, occupies the same position as his ancestor. If he becomes owner of a divided part of the estate the servitude burdens that part, and if he becomes owner of the whole the servitude burdens the entire estate."

The effective date for Article 719 was January 1, 1978, which was subsequent to acquisition of this land by the Acrees in 1977. Prior to the revision resulting in the present Article 719, Article 742 of the Louisiana Civil Code provided:

"Art. 742. If a coproprietor who has established a servitude, sell his undivided portion to a person, who afterwards, by licitation, becomes owner of the whole, he is, like his vendor, bound to permit the exercise of the servitude on the whole estate."

According to the comments, Article 719 of the Civil Code is but the logical extension of the former Article 742. At least one Louisiana court has recognized that the rule of Article 742 should not be limited to cases where the co-owner's successor acquired by licitation. In *Fawvor v. Crain*, 6 So.2d 227 (La.App. 1st Cir. 1942), the court said in dicta that:

"If the co-proprietor who has established a servitude sell his undivided interest to a person who afterwards becomes the owner of the whole, *either by licitation or the purchase of the interest of the remaining co-owners* who have not granted the servitude, then he is, like his vendor, bound to permit the exercise of the servitude as established by his vendor. See C.C. Articles 656, 657, 739, 740, 741, 742." Emphasis supplied.

This language was cited in A.N. Yiannopoulos, *Predial Servitudes; Creation By Title: Louisiana and Comparative Law,* 45 TLR 459 at 470 n. 74 (1971) where the commentator states: "Articles 738–742 of the Louisiana Civil Code *should apply by analogy,* ... The servitude granted by a person whose successor subsequently acquires the entire estate should exist on the whole." (Emphasis added)

The doctrinal basis for the rule under the Civil Code is stated in Pardessus, *Traité des Servitudes* 437 (1817). La. *Civ.Code* Art. 719 Comment; Yiannopoulos, supra. The rationale also serves to explain the rules set out in the Mineral Code:

"The grantee becomes absolute owner of the right of servitude from the moment of the grant; the stipulation is perfect and obligatory; but he may not exercise his right to the prejudice of the co-owners who have not consented. This right, once established on the property sold cannot be extinguished by the alienation, because servitudes follow the burdened estates even if the sale has been made free of any charges ... This right is merely suspended, and it must have its effect once the obstacles for its exercise are set aside." (Translation taken from Yiannopoulos, supra, at p. 466 n. 46 and p. 470 n. 75.)

█ Tulane granted Shell a valid lease. Thus, Shell became the absolute owner of a real right. See La. *Min.Code.* Art. 16 and Comment. The exercise of the clause in question was suspended while the land was owned in indivision. However, whether the right is viewed as an aspect of the mineral lease and governed by the Mineral Code, or a conventional servitude governed by the Civil Code, the obstacles to its exercise were removed when the Acrees gained the whole tract. Therefore, Shell has the right to build pipelines across the surface for the purpose of transporting minerals produced on "adjoining lands."

█ The final question to be decided by the Court is whether property which touches at a corner is "adjoining." The Acrees cite no authority and give no reason

to support their contention that Turner No. 3 is not on adjoining land. No minimum degree of of contiguity is specified in the lease. The Acrees' land and the tract upon which Turner No. 3 was drilled do touch. The fact that the two tracts of land meet and touch is sufficient to make them "adjoining." *Joint School District No. 10 v. Sosalla*, 3 Wis.2d 410, 88 N.W.2d 357 (1958); *State v. School Board of Joint Common School District*, 1 Wis.2d 208, 83 N.W.2d 724 (1957); *Independent Consolidated School District No. 66 v. Big Stone County*, 243 Minn. 341, 67 N.W.2d 903 (1954).

For the foregoing reasons, the Court finds that Shell is entitled to build a pipeline across the Acrees' land for the purposes for which the pipeline in question has been used. Therefore, plaintiffs' suit must be dismissed.

THEREFORE:

IT IS ORDERED that plaintiffs' suit be, and it is hereby DISMISSED with prejudice. Judgment shall be entered accordingly.