**Sam VEST and Rex Pigmon, Plaintiffs-Appellees,**

v.

**EXXON CORPORATION, Defendant-Appellant.**

No. 84–1246.

United States Court of Appeals, Fifth Circuit.

Jan. 16, 1985.

James R. Stevens, Jr., Houston, Tex., for defendant-appellant.

John Lee, Michael L. Fostel, Alan L. Castetter, Kermit, Tex., for plaintiff-appellees.

Before GEE, REAVLEY and RANDALL, Circuit Judges.

REAVLEY, Circuit Judge:

This appellate record is an interesting, even fascinating, one to read. Not that it presents a challenging legal puzzle, but it does display a predicament and frustration of surface-only landowners when the mineral lessees interfere with the surface use in order to pursue their opportunities and obligations in the extraction of minerals. From the viewpoint of the surface owner when mineral operations are conducted all across his land, interfering constantly with his ranching or farming, the mineral use becomes unreasonable. But the mineral operator who employs the usual and customary methods of the industry views the matter differently; it would be unreasonable for him to give way to grazing animals by not developing the underlying minerals, i.e., by not drilling wells and building roads and power lines and flow lines and tank batteries. The viewpoint of these parties on reasonableness is quite different. Sadly for the surface owner, Texas law, which governs in the present case, implies that a

mineral lease gives a large measure of deference to the lessee's view of reasonableness.

Sam Vest and Rex Pigmon, the plaintiffs, are West Texas ranchers, operating on vast acreage that includes the 1440 acres (2¼ sections) of present concern; the mineral working interest is owned by defendant Exxon Corporation. Fortunately for everyone except the plaintiffs, this 1440 acres is very rich in oil deposits. Prior to August of 1981 a number of wells were producing from this land, and at that time Exxon decided to undertake this new drilling program.

Plaintiffs and their neighbors have been able to recoup some of their loss due to oil operations on the land by obtaining payment from the operator. Oil companies apparently appreciate the viewpoint of the surface owners and, in order to avoid lawsuits as well as to obtain the cooperation of landowners, often make these payments—whether or not there is any legal obligation to do so. These plaintiffs had their own "Price Schedule For Right Of Way And Damages," which set a certain price for each wellsite, per rod of roadway and flow line for tank batteries, etc. Plaintiffs had negotiated with Exxon in the past from a basis of a similar demand or schedule, but in 1981 they demanded strict payment on the basis of the schedule. When Exxon refused to comply, the plaintiffs sued. The plaintiff Vest, who had not discussed the matter with the Exxon representative, testified that he expected payment according to that schedule or he would not have allowed the wells to be drilled. He explained which well locations on the map were in the Exxon drilling program and had "not been paid for." (R. 1–98) Plaintiff Pigmon explained that the drilling of the last 21 wells by Exxon, together with previous wells, was what eliminated the use of this land, because the wells then saturated the land. Therefore, it became impossible to run cows there. (R. 1–1–177 to 179)

■ There is a large difficulty with the schedule of the plaintiffs, their view of their entitlement reflected by their testimony, the largess of the jury, and the charge and judgment of the district court. That difficulty is the Texas law. In the absence of an express provision to the contrary, the Texas courts imply a dominant estate and right of a mineral lessee under a lease agreement to use as much of the surface estate, and in such manner, as is consistent with the extraction of the minerals in accordance with the purposes of the lease. The Texas courts do speak of a restriction upon the lessee to that use of the surface as is "reasonably necessary," but that is simply a limit on the manner in which the mineral operation is done, and it does not limit the right of the lessee to develop and extract minerals in accordance with the lease. *Humble Oil & Refining Co. v. Williams*, 420 S.W.2d 133 (Tex.1967). This right carries with it the legal privilege to use the surface of the land and to interfere with the surface owner's use of it. The surface estate is servient in this respect to the dominant mineral estate.

Texas law (legislative, judicial, and administrative) has often favored the oil and gas operator over the royalty or surface owners. To this point in the present case, however, the table has been turned. The plaintiffs enjoy a judgment for $288,000 for a growth of grass on this West Texas land plus $332,800 for injury to the land, the same land that had a market value (according to the only evidence on the issue in the record) of only $216,000. This judgment was predicated upon a verdict without support in the evidence. And if the jury paid any attention to the court's instruction on the law, which is doubtful, the learned judge there erred.

The jury verdict first.

■ The jury found that 1360 acres were permanently damaged, that the market value of the land was $230 an acre before the damage was done and was worthless thereafter. There is in this record no evidence of either of those before and after market values, and there is no evidence here that 1360 acres have been permanently damaged by Exxon. The plaintiffs, being the surface landowners, would be permitted

under Texas law to testify to their opinion of the market value of the land. They did testify about the value of the land to them, but they did not purport to testify about its market value. *See Porras v. Craig,* 675 S.W.2d 503 (Tex.1984). The attorneys for plaintiffs insist that the jury could have found a market value somewhere between $150 an acre and $3,333 an acre. The latter figure is derived from a statement by plaintiff Pigmon to the effect that the surface was worth $5,000 for a well site. This was the price which he had placed on his schedule for a 1½ acre well site. If this were actually the value of the land, one acre would be worth $3,333. The fact that plaintiff wanted to exact that price, for something to which he was not legally entitled, is no evidence of market value. While there is some evidence that small areas of the land were unnecessarily damaged by Exxon's operations, there was no evidence that the locations themselves were unnecessary or that the drilling program was not justified development of the minerals. The plaintiff Pigmon testified that he could no longer run cattle on the land; but the cause of this, under his testimony, was the number of the well locations and roads and other apparatus and not anything that was placed on the land or done on the land that was unreasonable or unnecessary for the mineral development. (R. 1–242, 243)

■ The jury found that the grass growing on this land was damaged to the extent of $288,000. Plaintiffs would be entitled to the loss of any grass that was damaged or destroyed by Exxon's operations, without respect to the reasonableness of the mineral development. Under the lease the lessee is required to compensate for damage to growing crops, and grass is considered a growing crop. There is no evidence in this record on the extent of damage to grass caused by Exxon's drilling of these 21 wells. Nor is there any evidence of the market value of grass that was destroyed. Attorneys for plaintiffs point to two places in the evidence for support of this feature of the verdict. Plaintiffs testified that they had undertaken a program of improvement of this land by root plowing and reseeding it at a certain expense per acre. The cost of that operation has no bearing on the market value of the grass standing on the land in late 1981. The second argument is based upon the testimony of Exxon's appraiser that the land would support 45 animal units at a value of $6400 per unit. These figures may well have been the basis for the jury verdict, because when multiplied they produce exactly the figure of that verdict. However, the appraiser did not relate these figures to the grass value. It was part of his determination of the value of the land itself. (R. 2–82)

■ The jury set the temporary damages to plaintiffs' land at $20,000. There is evidence that the cost of removal of shredded plastic, used to line the mud pits of the well sites and then shredded by the bulldozers in the process of restoring the site, would be $5000. There is also evidence that it was necessary to clean out a caliche pit into which had been dumped chemicals and debris, but there was no evidence of the amount of this expense. The attorney for plaintiffs in arguing to the jury, contended that there were no temporary damages, only permanent damages. We see no explanation for the figure the jury chose.

■ The jury also found that the parties had agreed on the price schedule and that the damages for the breach of the agreement were $228,965.79. This part of the verdict served as no basis for the judgment, but we note that there is no evidence in this record that these parties agreed that the plaintiffs would be paid by Exxon for the right to conduct this drilling program on the basis of plaintiffs' "schedule." The most that could be said for the testimony of the plaintiffs was that they might have expected such a payment. The plaintiff Pigmon, who was the one that dealt with Exxon's representative, testified that the representative was supposed to "get back to me after he talked to his people." Thereafter, the only conversation to which he testified was that Exxon refused to pay on that basis. (R. 1–185, 187)

The district court instructed the jury, in part, as follows:

> Defendant ... has the right implied in the lease by law to use as much of the surface of Plaintiffs' property as is reasonably necessary for ordinary and customary drilling and producing operations as contemplated in the lease by the parties. However, this right must be exercised with due regard to the rights of Plaintiffs. This is better understood as *the Defendant is not permitted to* unnecessarily destroy or *substantially impair Plaintiffs' land surface for agricultural purposes* or for other purposes that the surface is reasonably suited for. (emphasis added)

The cases do impose on the operator a requirement of due regard for the rights of the surface owner. *See Moser v. U.S. Steel Corp.,* 676 S.W.2d 99, 103 (Tex.1984); *Sun Oil Co. v. Whitaker,* 483 S.W.2d 808, 810 (Tex.1972); *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex.1971). Without further explanation a statement of this nature is easily misunderstood. It is not intended to limit the decision of the operator on whether to extract any part or all of the minerals. It refers to the method of the lessee's operation. There is no indication in the present record of anything improper, or of lack of due regard in this sense, on the part of the operator in the choices for the locations of the wells and facilities. The only evidence of lack of due regard was the cutting of the plastic liner into pieces that blew over the land and the spilling of some oil and chemicals, all having a minor effect upon the use and value of the land. But the instruction of the court went much further than what would be permitted under Texas law, because it states that the due regard owed to the surface owners means that Exxon is not permitted to substantially impair plaintiffs' land surface for agricultural purposes. This is precisely the claim of the plaintiffs here: the number of the wells and facilities prevented them from continuing to operate as a ranch. However, as long as Exxon was following proper industry methods, its lease gave it the right to use the surface of the land even if it did substantially impair plaintiffs' land surface for their ranching purposes.

Exxon objected to the quoted portion of the court's charge, and it moved for a directed verdict when the plaintiffs rested and when the evidence was closed. The district court should have sustained the objection to this portion of the charge and should have granted Exxon a directed verdict on plaintiffs' claim for breach of contract. Plaintiffs raised an issue of temporary damages to their land as a result of the plastic pieces that would have cost $5000 to remove, and likewise there was an issue raised as to some small oil spills and other excessive uses of the land that resulted in limited damage of either a temporary or a permanent nature. The judgment is reversed and the cause is remanded to the district court for new trial.

REVERSED and REMANDED.