Jon R. CARRIGAN, Larry Carrigan and LaVelle Carrigan, Plaintiffs–Appellants,

v.

EXXON CO. U.S.A., Defendant–Appellee.

No. 87–1350.

United States Court of Appeals, Fifth Circuit.

July 11, 1989.

---

**7.** *See Umphlet v. Connick,* 815 F.2d 1061, 1063 (5th Cir.1987); *Koonce v. Quaker Safety Products & Mfg. Co.,* 798 F.2d 700, 706 n. 8 (5th Cir.1986).

Dan Sullivan, Andrews, Tex., for plaintiffs-appellants.

Michael D. Jones, Exxon Co., Houston, Tex., for defendant-appellee.

Before THORNBERRY, KING and JONES, Circuit Judges.

KING, Circuit Judge:

Plaintiffs-appellants are landowners who sued defendant-appellee for damages resulting from its oil and gas operations on the plaintiffs' land. Plaintiffs also sought an injunction requiring that defendant bury its pipelines on the land. The district court awarded money damages to the plaintiffs, but denied injunctive relief. Plaintiffs appeal that portion of the district court's decision which denies the injunction requiring pipeline burial. Finding that the district court correctly interpreted the oil and gas lease and its modifications so as not to include the right plaintiffs seek to assert here, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

The original plaintiffs, Jon R. Carrigan and Larry Carrigan ("the Carrigans")[1] are the surface owners of property in Andrews County, Texas (the "property"). The Carrigans' predecessors in interest executed identical oil, gas and mineral leases (the "original leases" or the "leases") to various sections of land that they then owned, including the property, on March 7, 1934.[2] The defendant Exxon Corporation ("Exxon")[3] is the successor in interest to the original lessee of the mineral estate. The property is also subject to a unitization agreement (the "Unitization Agreement"

1. LaVelle Carrigan was later added as a party plaintiff in this suit. Reference to "the Carrigans" in this opinion includes her where appropriate. Because her inclusion in this lawsuit makes no difference to the outcome of this appeal, we make no effort to distinguish between "the Carrigans" before and after she was added as a party.

2. Mr. and Mrs. A.J. Eilers owned the property when the oil, gas and mineral leases were executed. Later, the Eilers conveyed the property to the McKean–Eilers Company. That company

subsequently dissolved and the heirs of the original shareholders of the company received fractional interests in the property. The Carrigans purchased their holdings from these heirs. Throughout this opinion we refer to these various interest holders as "the Carrigans' predecessors in interest."

3. The plaintiffs incorrectly referred to the defendant in their original complaint as "Exxon Company, U.S.A.," and they continue to do so on appeal. Therefore the style of this case incorrectly identifies Exxon.

or the "Agreement")[4] which was ratified by the Carrigans' predecessors in title and which became effective in February 1954.

The Carrigans filed this suit against Exxon seeking money damages, injunctive relief and attorneys' fees. The complaint alleged that Exxon, as the successor to the original lessee and the current oil and gas operator of the property, had damaged the Carrigans' interest through use of more of the property than was reasonably necessary, through oil and chemical spills and through the careless discarding of litter and debris. Further, the Carrigans sought to permanently enjoin Exxon to bury all of its pipelines below plow depth, to abandon the cut-off roads they had been using, to clean up the property and to provide safety training to the Carrigans, their families and their employees concerning the dangers of H₂S gas.[5] Exxon removed the action to the United States District Court for the Western District of Texas, asserting diversity of citizenship as the ground for removal.

After removal, Exxon answered the complaint and asserted a counterclaim against the Carrigans. In the counterclaim, Exxon alleged that the Carrigans had repeatedly violated the terms of the leases and the Unitization Agreement by barring Exxon's access to the property. Exxon sought to permanently enjoin them from continuing to block Exxon's access to the property and sought costs and attorneys' fees.

After a bench trial, the district court entered judgment awarding money damages to the Carrigans for damage to the surface of the property resulting from salt-water spills, cathodic wells, excessive litter and for damages to the Carrigans' cattle

grazing business. The district court found that the money damages were an adequate remedy for the claims of property damage and also concluded that the Carrigans were not entitled to injunctive relief. The court based this conclusion on two grounds: 1) the provision in the original lease which allowed the lessor to require the lessee to bury its pipelines below plow depth had been abrogated by the later Unitization Agreement, and 2) the deeds which conveyed the surface interest in the property to the Carrigans reserved to the grantor the right to require the burial of pipelines, and therefore, the Carrigans obtained no such right. The court therefore refused to award the Carrigans the injunction they sought, and, because it held against them on this point, it also denied attorneys' fees.[6] The Carrigans appeal to this court only those portions of the district court's judgment which refused to grant an injunction requiring Exxon to bury its pipelines on the property and refused attorneys' fees.

## II. THE APPEAL

### A. Appellants' Arguments

On appeal the Carrigans argue that neither ground for the decision below is valid. With respect to the first, the Carrigans assert that their predecessors in interest, who owned the surface estate, royalty interests and a reversionary interest in the mineral estate at the time of the execution of the Unitization Agreement, entered that Agreement in their capacities as royalty interest owners, not as owners of the surface estate, and therefore could not have abrogated their right to require the lessee to bury its pipelines. With respect to the

---

4. A unitization agreement is ordinarily entered into by neighboring property owners and mineral lessees. It serves to create a single unit from many separate parcels of land, thereby reducing costs of producing the underlying minerals. Such agreements are most often entered before the start of expensive secondary recovery operations.

5. H₂S gas is a hazardous by-product of the production of oil and natural gas.

6. Exxon filed a notice of appeal from the district court's failure to award the injunctive relief

it had sought in its counterclaim. While that appeal was pending, the district court made a request under Federal Rule of Civil Procedure 60(a) for leave to amend its judgment so as to grant the injunctive relief sought by Exxon. A panel of this court determined that no final judgment had been entered by the district court under Federal Rule of Civil Procedure 54(b) concerning Exxon's counterclaim and therefore ruled that the district court remained free to amend its judgment. The district court then amended its judgment to grant Exxon the requested relief. Neither party appeals this aspect of the district court's judgment.

second ground for the decision below, the Carrigans contend that the district court's construction of the deeds is erroneous. They argue that the Carrigans' predecessors in title reserved to themselves the reversionary interest in the severed mineral estate, but that the right to require pipeline burial is a covenant running with the land which will not be detached without express language detaching it. Such express language, the Carrigans contend, is not present here.[7] Because we agree with the district court that the Unitization Agreement abrogated the surface owners' right to require pipeline burial, and because such an abrogation is dispositive of this appeal,[8] we do not address the other ground the Carrigans assert for reversal.

### B. Standard of Review

■ The Carrigans' arguments for reversal are based upon contentions that the district court erroneously construed written instruments. The construction of the unambiguous terms of a contract is a question of law and as such is subject to de novo review. *Strachan Shipping Co. v. Dresser Indus., Inc.,* 701 F.2d 483, 487 (5th Cir.1983). The determination of whether a contract's terms are ambiguous is also subject to de novo review. *City of Austin v. Decker Coal Co.,* 701 F.2d 420, 425–26 (5th Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). The parties' intent in entering a contract may also be a question of law if such intent is "revealed solely by the contract." *Id.* at 426 n. 18. Therefore, because the district court's decision relied on no factual determinations extrinsic to the various contracts and written instruments at issue, we review its determination de novo. Our jurisdiction in this case is based on diversity of citizenship. We therefore function as an *Erie* court and must, to the best of our ability, apply Texas law as we think a Texas court would.

### III. THE AVAILABILITY OF THE REMEDY SOUGHT

It is well-settled in Texas law that, absent express lease provisions to the contrary, the mineral estate is dominant to the surface estate, and the owner of the mineral estate may use as much of the surface estate and in such a manner as is reasonably necessary for its operations. *Vest v. Exxon,* 752 F.2d 959, 961 (5th Cir.1985); *Humble Oil & Refining Co. v. Williams,* 420 S.W.2d 133, 134 (Tex.1967). The Carrigans do not assert on appeal that above-the-ground pipelines are not reasonably necessary to Exxon's operations; rather, they argue that they have an express right to require burial. We therefore look to the original leases coupled with the later Unitization Agreement to determine if they contain an express provision requiring burial.

### A. The Leases

The original leases, executed by the Carrigans' predecessors in interest and under which Exxon owns a determinable interest in the mineral estate, contain two relevant provisions. The first is found in paragraph 1 of the leases:

Lessor in consideration of—Ten and no/100 Dollars ($10.00), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, *laying pipe lines,* building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport and own said products, and housing its employees [the property].

---

7. At oral argument, Exxon argued a third theory for affirming the district court's disposition. It argued that the covenant regarding pipeline burial had been abrogated by changed conditions. Because that argument was not raised below, we decline to address it here. *See, e.g., White v. Grinfas,* 809 F.2d 1157, 1162 (5th Cir.1987).

8. The Unitization Agreement was executed before the execution of the deeds conveying the land to the Carrigans. Because we hold that the Agreement abrogated the asserted covenant to require pipeline burial, that covenant could not have been conveyed by the later deeds.

(Emphasis added). Paragraph 6 of the instruments contains the following provisions: "Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth...." Therefore, the leases unambiguously provided the right to require pipeline burial. The leases contain no other provisions explicitly protecting the rights of the surface estate; [9] under these leases, aside from having the power to require pipeline burial, the lessor would have had no contractual remedy in the event that the lessee's operations interfered with the surface estate. *Reading & Bates Offshore Drilling Co. v. Jergenson*, 453 S.W.2d 853, 854–55 (Tex.App.—Eastland 1970, writ ref'd n.r.e.). Rather, in such circumstances, the lessor would have had to turn to the implied covenant of reasonable and non-negligent use for a remedy. *See Brown v. Lundell*, 162 Tex. 84, 344 S.W.2d 863, 865 (1961). If the lessee's operations were determined to be reasonable and not negligent, the lessor would not have been able to obtain any relief. *Vest*, 752 F.2d at 961; *Humble Oil*, 420 S.W.2d at 134–35.

## B. The Unitization Agreement

The Carrigans' predecessors in interest to the property ratified the Unitization Agreement in 1953, approximately nineteen years after the original leases were executed. The Agreement grants to the Unit Operator the exclusive right to explore for and produce oil, gas and other minerals on the lands which constitute the Unit as defined by the Agreement. Executors of the Agreement include the Unit Operator, the royalty owners and the working interest owners. "Royalty owner" is defined in Article I of the Agreement to include: "any owner who, subject to a working interest owner's [10] right to search for and produce unitized substances, owns land, mineral rights, royalties, overriding royalties, payments out of production, reversionary interests, net profits interests or other similar rights in and to the unitized substances that may be produced and saved from the unit area...."

■ By construing the unambiguous terms of this definition, we can address the threshold argument propounded by the Carrigans. That argument asserts that the Carrigans' predecessors in interest signed the Unitization Agreement in their capacities as owners of royalty interests in the property, rather than as surface owners and that those predecessors therefore did not abrogate any surface rights they may have had under the original leases. The Carrigans' assertion that their predecessors in interest signed the instrument as "royalty owners" is correct; however, "royalty owner," is, as quoted *supra*, defined in the Agreement to include an owner of *land*. The Texas courts have broadly construed the word "land" when it is used in a deed. It is defined to include "the surface of the earth and everything over and under it." *Averyt v. Grande, Inc.*, 717 S.W.2d 891, 894 (Tex.1986); *see also Sharp v. Fowler*, 151 Tex. 490, 252 S.W.2d 153, 154 (1952); *Holloway's Unknown Heirs v. Whatley*, 133 Tex. 608, 131 S.W.2d 89 (1939). Thus, when the drafters of the Unitization Agreement chose to include "land" among those interests a "royalty owner" might possess, they included the ownership of a surface estate as a possible interest. Therefore, they defined "royalty owner" in a way that included the Carrigans' predecessors in title to the full extent of their interests in the property. That is, because all of the potential interests listed are expressly defined as "subject to a

9. The leases do protect the water supply of the surface estate by including a provision preventing the lessee from using water from the lessors' wells, although they allow for use by the lessor of other water on the land.

10. "Working interest owner" is defined by the Agreement to mean "any owner ... of an oil and gas lease ... who ... has the right ... to explore, develop and operate a separately owned tract for oil or gas, or both, and in so doing would be chargeable ... with a proportionate part of the cost and expense of such operations...."

working interest owner's right to search for and produce unitized substances," the inclusion of land ownership in the list clearly contemplates the combination of interests the Carrigans' predecessors owned—i.e., the surface estate, a royalty interest, and a reversionary interest in the mineral estate of the property—which amounts to every interest in the property except for that held by the working interest owner. Therefore, while the Carrigans' predecessors may have signed the Agreement as "royalty owners," that term is explicitly defined by the Agreement to be inclusive of all of the interests they owned at the time. The Carrigans' argument to the contrary then fails by the terms of the Agreement.[11]

Because the Carrigans' predecessors in interest signed the Unitization Agreement in their capacities as owners of land, they may have, by signing that agreement, abrogated some of the rights in the surface they had held under the earlier leases. The Agreement contains a provision that "[it] shall amend and modify all existing leases ... to the extent that the provisions of such existing leases ... are in conflict with the provisions of this agreement." The Agreement does not address the issue of the lessors' right to require the operator to bury its pipelines.

■ We have previously held that a clause in a mineral lease providing the lessor with the right to require the burial of pipelines to be in the nature "of a limitation on the mineral owner's surface rights ... [which] would remain forever with the surface estate in the absence of certain circumstances, among which [are] express detachment or abrogation...." *Manges v. Gulf Oil Corp.*, 394 F.2d 487, 488 (5th Cir.1968) (applying Texas law and relying on *Mobil Oil Corp. v. Brennan*, 385 F.2d 951 (5th Cir.1967)). Therefore, the issue presented is whether the terms of the Unitization Agreement conflict with the original leases so as to abrogate the lessors'

right to require pipeline burial even in the absence of an explicit clause abrogating that right. As we discuss below, we conclude that the broad grant of right of way over the property to the Unit Operator in the Agreement conflicts with the pipeline burial clause in the original leases, and that clause therefore does not survive the execution of the Unitization Agreement.

A description of the surface use contemplated by the Agreement is found in Article IX, paragraph 20:

IX.  USE OF SURFACE

20.  The working interest owners and royalty owners, to the extent of their rights and interests, hereby grant to the Unit Operator the right to use or permit the use of as much of the surface of the land within the unit area as may be reasonably necessary for the development and operation of the unit area and for other operations conducted by the Unit Operator in accordance with the provisions of this agreement and of any agreement or agreements executed by the working interest owners for the operation and development of the unit area: Provided, that nothing in this paragraph 20 shall be construed as leasing or otherwise conveying to the Unit Operator or to the working interest owners a site or location for a gas injection, processing or other plant. The Unit Operator shall have a right of way over and across such land, and the right of ingress and egress thereto and therefrom, for the laying, constructing, using, maintaining, operating, changing, repairing and removing of pipe lines, tanks and other facilities for gathering, storing, treating and handling unitized substances, gas, outside gas and other substances, for returning gas and other substances from a plant, for conveying unitized substances, gas, outside gas and other substances to and into input wells and for metering and measuring unitized substances, outside gas and other substances, together with a right of way for the purpose of constructing, erecting, using, maintaining, operating,

---

11.  Additionally, as we discuss *infra,* an entire article of the Agreement is devoted to the Unit Operator's use of the surface under the Unitization Agreement. Such a discussion would not

have been necessary if none of the parties to the agreement entered that Agreement as an owner of surface rights.

changing, repairing, enlarging and removing telegraph, electric and telephone lines, water lines, buildings and roads. The Unit Operator, for the joint account of the working interest owners, shall pay all damages to growing crops, timber, fences, improvements and structures in the unit area resulting from the exercise of the rights and privileges acquired under the provisions of this paragraph 20.

The terms of this paragraph create a conflict with the pipeline burial clause of the original leases. As royalty owners—which, we have shown, means also "landowners"—the Carrigans' predecessors in interest had rights in the surface estate, *including* the right to require pipeline burial. They grant to the Unit Operator in the Unitization Agreement the right to use as much of the surface as may be *reasonably necessary;* thus, the grant is as broad as the Texas courts would imply absent an express provision limiting the right of use. *See Vest,* 752 F.2d at 961; *Humble Oil,* 420 S.W.2d at 134. Further, the grant is made explicitly *to the extent of the rights* of the grantors, which must necessarily include their right to require burial. As a surface right, then, the right to require burial is included in the grant to the Unit Operator. Thus, as long as above-the-ground pipelines are reasonably necessary—and no one disputes on appeal the district court's conclusion that Exxon's use of the surface for pipelines is reasonable—such pipelines are allowed by the terms of the broad grant to the Unit Operator. Therefore, the leases' provision allowing for the surface owner to require pipeline burial conflicts with this broad grant of rights to the Unit Operator in the Agreement, and the Agreement by its express provisions governs in cases of conflict. The broad grant of surface rights in the Agreement abrogates the right to require pipeline burial.

Finally, we note that the Unitization Agreement provides the surface estate owners with a new right to seek money damages for surface injury resulting from necessary use not provided in the leases, and not implied by Texas law. *See, e.g., Texaco, Inc. v. Spires,* 435 S.W.2d 550, 553 (Tex.App.—Eastland 1968, writ ref'd n.r.e.). Paragraph 20 expressly grants the surface owners the right to payment of "damages to growing crops, timber, fences, improvements and structures" resulting from the Unit Operator's use of the surface. In fact, the district court awarded money damages to the Carrigans for surface damages under the terms of this provision. The inclusion of a remedy for surface damages lends added support to our holding that the pipeline burial provisions of the leases were abrogated by the Unitization Agreement. The provision demonstrates that the parties to the Agreement were aware of the danger that the oil and gas operations would interfere with the surface use of the property. The parties chose to deal with this danger in a way different from that in the original leases: They allowed for the payment of money damages rather than providing for pipeline burial upon demand.

## C. Attorneys' Fees

Because we agree with the district court that Exxon has not breached its contract with the Carrigans, we also agree with that court's denial of attorneys' fees.

## IV.

Therefore, because we conclude that the district court properly denied the injunction and the request for attorneys' fees, we AFFIRM.