2004-NMSC-025

93 P.3d 1272

**Raymond L. KYSAR, Patsy Sue Kysar, and The Kysar Family Trust, Plaintiffs–Appellants,**

v.

**AMOCO PRODUCTION COMPANY, Defendant–Appellee.**

**No. 28,231.**

Supreme Court of New Mexico.

June 5, 2004.

Victor R. Marshall & Associates, P.C., Victor R. Marshall, Albuquerque, NM, for Appellants.

Holland & Hart, L.L.P., Bradford C. Berge, Tanya M. Trujillo, Santa Fe, NM, for Appellee.

Hubert & Hernandez, P.A., Lee E. Peters, Las Cruces, NM, for Amicus Curiae New Mexico Farm & Livestock Bureau.

## OPINION

MINZNER, Justice.

{1} In this opinion, we discuss the surface access rights of a mineral lessee by virtue of a communitization agreement, which the lessee was authorized to execute by a prior owner of the fee. We do so in order to answer two questions certified by the United States Court of Appeals for the Tenth Circuit. These questions arose in an appeal to the Tenth Circuit by Plaintiffs Raymond L. Kysar, Patsy Sue Kysar, and The Kysar Family Trust ("the Kysars") following the grant of summary judgment in favor of Defendant Amoco Production Company ("Amoco") by the United States District Court for the District of New Mexico. We have jurisdiction under NMSA 1978, §§ 39–7–1 to –13 (1997) and Rule 12–607 NMRA 2004.

{2} The first question certified is:

Under New Mexico law, does a mineral rights lessee, by virtue of a Communitization Agreement to which the mineral rights lessee is a party, gain a right of access over the surface estate of the unitized portion of the leased area in connection with operations on other premises or lands pooled or unitized therewith where the lease did not expressly grant this right?

*Kysar v. Amoco Prod. Co.*, 73 Fed. Appx. 349, 349 (10th Cir.2003). We conclude that under New Mexico law a mineral rights lessee, having entered into a communitization agreement with the permission of the prior fee owner, enjoys a right of access over the surface estate of the portion of the leased area subject to the agreement. Thus, we answer the first question "Yes."

{3} The second question certified is:

Under New Mexico law, does a mineral rights lessee, by virtue of a Communitization Agreement to which the mineral rights lessee is a party, gain a right of access over the surface estate of the non-unitized portion of the leased area in connection with the production and extraction of minerals on other premises or lands pooled or unitized therewith where the lease did not expressly grant this right?

*Id.* We conclude that under New Mexico law a mineral rights lessee does not, by virtue of having entered into a communitization agreement with the permission of the prior fee owner, enjoy a right of access over the surface estate of the portion of the leased area that is not subject to the agreement. Thus, we answer the second question "No."

{4} We draw a distinction between the situations to which the two certified questions refer on the basis of the implied rights the mineral lessee enjoys in each situation. In drawing this distinction, we rely on the statutory and case law governing pooling and unitization that have developed in other jurisdictions; the purposes served by communitization agreements, which typically govern pooling and unitization on federal land; our own case law governing easements; and documents relevant to Amoco's rights, which contain phrases typical of pooling and unitization arrangements. Under New Mexico law, we conclude that a communitization agreement entered into with the permission of the fee owner supports an implied surface access right over land subject to that agreement but not over land that is not subject to the agreement. By "subject to the agreement" we intend to refer to the property actually committed to a joint or pooled operation by inclusion within the relevant unit.

I

{5} The certified questions arose from a dispute involving surface access to a gas well. The gas well is located on property adjacent to the property over which access is claimed. The relevant facts are undisputed.

{6} The Kysars own a ranch on the Animas River in San Juan County, New Mexico. Amoco is the lessee, under two leases executed by the Kysars' predecessors-in-title, of mineral estates located under the Kysars' ranch. Amoco is also, pursuant to a lease with the federal government, the lessee of the mineral rights underlying land owned by the Bureau of Land Management ("BLM") that is adjacent to the Kysars' property.

The Kysars own property found in several different sections as shown on the schematic drawing below. We focus on property they own in Section 34, Sections 27 and 28, and in Section 22. The portion of Section 22 owned by the Kysars consists of 37 acres, and that portion of Section 22 is subject to the same communitization agreement to which the Sullivan E Well, also within Section 22, is subject.

The Kysars brought an action for damages as a result of Amoco's use of roads on their ranch to develop and operate the Sullivan Gas Com E–1 Well ("the Sullivan E Well"), which is located on the BLM land. The BLM land is subject to a 1992 Communitization Agreement.

{8} The Sullivan E Well can be reached by two possible access roads that cross the Kysars' property. One road is the "Back Gate Road," which crosses portions of the Kysars' property in Sections 27 and 34. The other is the "Bridge Road," which crosses portions of the Kysars' property in Sections 27 and 28.

The Bridge Road goes across a bridge that cannot support the heavy machinery and equipment Amoco's trucks must carry to and from the Sullivan E Well. As a result, Amoco presently uses the Back Gate Road to access the Sullivan E Well. Amoco also uses this road to operate several other gas wells located on the Kysars' property, within leases granted by the Kysars' predecessors-in-title. The Kysars are not contesting Amoco's use of these roads to access the wells located on their ranch.

{9} The northern part of the Kysars' ranch was once owned in fee by Maude Keys. In

1948, she signed an oil and gas lease ("the Keys lease") to Amoco's predecessor-in-title, leasing her land for purposes of "mining and operating for and producing oil and gas" in exchange for a royalty. Most of the land leased by Keys is located in Sections 27 and 28. The 37 acres in the southwest corner of Section 22 is the most northern portion of the Keys leasehold. The Keys lease contained no provision allowing the mineral lessee the use of the surface to reach other tracts located outside the land covered by the lease.

{10} The southern portion of the Kysar property, in Section 34 and the southern portion of Section 27, was originally owned by Onofre and Alvina Jaquez, who in 1948 executed a similar lease ("the Jaquez lease") to Amoco's predecessor-in-title. The Jaquez lease also contained no provision allowing the mineral lessee the use of the surface to reach other tracts located outside the land covered by the lease. In 1950, Onofre and Alvina conveyed their land to Keys, reserving one-half the oil, gas, and mineral rights.

{11} The Keys and Jaquez leases were amended in 1953, by separate documents, to provide the lessee the power "at its option and without [l]essor's joinder or further consent to pool and unitize the leasehold estate and the [l]essor's royalty estate ... with the rights of any third parties ... so as to create ... one or more drilling or production units." Both amendments provided that "[e]ach such drilling or production unit shall not exceed 320 acres," and both contained virtually identical clauses providing:

[T]he commencement, drilling, completion of or production from a well, or any portion of a unit created hereunder, shall not have the effect of continuing this lease in force insofar as it covers the land not included within such unit, and no unit shall be created which covers and includes land in more than one Section.

{12} Keys sold her land in 1956, reserving "all oil, gas, and other minerals." The deed also contains the phrase: "With right of ingress and egress for removal of the same." The Kysars purchased their ranch about 1983. Amoco entered into the communitization agreement in 1992. The Kysars did not sign or otherwise consent to the agreement. The only portion of the property Keys had leased to Amoco's predecessor-in-title that is subject to the agreement is the 37 acres the Kysars own in Section 22. No part of the property Jaquez had leased to Amoco's predecessor-in-title was subject to the 1992 agreement. Neither the Bridge Road nor the Back Gate Road cross any portion of the area subject to the communitization agreement.

{13} The Kysars filed a complaint in state district court alleging that Amoco's use of these roads in order to operate and service the Sullivan E Well constituted unlawful trespass and unfair trade practices under New Mexico law, and Amoco removed the case to federal court. The Kysars moved for partial summary judgment on liability; Amoco also moved for summary judgment. In granting Amoco's motion for summary judgment, the district court held in a well-reasoned written opinion that the 1992 Communitization Agreement authorized Amoco to use portions of the Kysars' property located in Sections 22, 27, 28 and 34 in order to access the Sullivan E Well.

{14} The district court first addressed the question of Amoco's right to use the surface of the Kysars' property within Section 22. The court noted that Tenth Circuit precedent supported the view that operations conducted anywhere within an area subject to a communitization agreement were deemed to occur on each lease within that area. *See Cheyenne–Arapaho Tribes of Oklahoma v. United States,* 966 F.2d 583, 585 (10th Cir.1992); *Kenai Oil & Gas, Inc. v. Dep't of Interior,* 671 F.2d 383, 384 (10th Cir.1982). The court reasoned that under that view the mineral lessee ought to enjoy an implied right of access to the entire surface subject to the agreement, as state courts had held. *See Prop. Owners of Leisure Land, Inc. v. Woolf & Magee, Inc.,* 786 S.W.2d 757, 760 (Tex.App. 1990); *Gulf Oil Corp. v. Deese,* 275 Ala. 178, 153 So.2d 614, 618–19 (1963).

{15} The district court next addressed the question of Amoco's right to use the surface of the Kysars' property within the Sections 27 and 28 portions of the Keys leasehold. Having observed that under the Mineral

Leasing Act, 30 U.S.C. § 226(m) (2000), the federal government has the power to alter the terms of leases subject to a communitization agreement, the court reasoned that "[a] communitization agreement has the effect of changing the terms of [the lease] pooled within the communitization area, so that the entire lease, not just that portion of the land within the unitization area, is subject to the benefits and burdens of communitization." *See Acree v. Shell Oil Co.*, 548 F.Supp. 1150, 1155 (M.D.La.1982), *aff'd*, 721 F.2d 524 (5th Cir.1983); *Wolff v. Belco Dev. Corp.*, 736 P.2d 730, 733 (Wyo.1987).

{16} Finally, the district court addressed the question of Amoco's right to use the surface of the Kysars' property within the Jaquez leasehold. The district court concluded that Amoco had the right to use the surface of the Kysars' property located in the Jaquez leasehold, because the communitization agreement should be understood to have modified the terms of the underlying lease. Relying on *Mountain Fuel Supply Co. v. Smith*, 471 F.2d 594, 597 (10th Cir.1973), the court concluded that Amoco had the right to use all of the Kysars' land for access to the Sullivan E Well. The court reasoned that after the Kysars acquired the several parcels within Sections 22, 27, 28, 33, and 34, those parcels should be considered one surface parcel, to all of which Amoco's implied right of access, as a result of the communitization agreement, extended.

{17} On appeal to the Tenth Circuit, the Kysars argued that the communitization agreement did not permit Amoco to use the Bridge Road or the Back Gate Road to reach the Sullivan E Well. The Kysars contended, among other things, that their predecessors-in-title never expressly granted an easement for that purpose and under New Mexico law no implied easement existed. *See Amoco Prod. Co. v. Sims*, 97 N.M. 324, 326, 639 P.2d 1178, 1180 (1981); *Rio Costilla Coop. Livestock Ass'n v. W.S. Ranch Co.*, 81 N.M. 353, 357, 467 P.2d 19, 23 (1970). Amoco contended that it was entitled to use as much of the Kysars' property as was reasonably necessary to produce oil and gas within the area subject to the agreement, on the basis of rights implied as a result of the agreement.

*See Amoco Prod. Co. v. Carter Farms Co.*, 103 N.M. 117, 119, 703 P.2d 894, 896 (1985); *Sims*, 97 N.M. at 326, 639 P.2d at 1180.

{18} We construe the questions certified to us by the Tenth Circuit as follows: (1) whether, as a result of the 1992 Communitization Agreement, Amoco has the right to use the surface of the Kysars' property located within Section 22 to reach the Sullivan E Well and (2) whether, as a result of the 1992 Communitization Agreement, Amoco has the right to use the surface of the Kysars' property acquired from Keys and located within Sections 27 and 28 to reach the Sullivan E Well. More specifically, the second certified question is whether Amoco has the right to use either the Bridge Road or the portions of the Back Gate Road that cross the surface of the Kysars' ranch they acquired from Keys to reach the Sullivan E Well. We do not understand the second certified question to include Amoco's right to use those portions of the Back Gate Road that cross the surface of the Kysars' property acquired from Jaquez. *See* § 39–7–5 (describing our power to reformulate the certified questions); Rule 12–607(C)(4) (describing the contents of the certification order).

{19} We agree with Amoco that, as a result of the 1992 Communitization Agreement, it is entitled to the reasonable usage of the Kysars' surface estate within Section 22 in order to reach the Sullivan E Well. We do not believe, however, that Amoco is entitled, as a result of that agreement, to the reasonable usage of the surface of the Kysars' land acquired from Keys and located within Sections 27 and 28 to reach the Sullivan E Well. Our reasons are as follows.

## II

{20} The law of pooling and unitization is a relatively new area of law. "One of the most significant developments in recent years in the producing branch of the oil industry has been the increasing frequency with which separately-owned properties are being pooled or unitized for production purposes." A.W. Walker, Jr., *Preface* to Leo J. Hoffman, *Voluntary Pooling and Unitization*, at iii (1954). Although advocacy for integrating producing properties gained little support in the 1920s,

*id.,* amendments to the Mineral Leasing Act in the 1930s first authorized the Secretary of the Interior to approve cooperative or unit plans for federal land. 2 Lewis C. Cox, Jr., Rocky Mountain Mineral Law Foundation, "Unitization and Communitization," *Law of Federal Oil and Gas Leases,* § 18.02[1], at 18–6 to –10 & n. 22 (2003). By the mid–1950s, the basic federal statutory scheme was in place, *see id.* § 18.02[1], at 18–11 to –12, and statutes in many states authorized compulsory pooling or unitization. *Hoffman, supra,* at 2 n. 1. In New Mexico, for example, the state is authorized to issue orders providing for unitization and unit operation of a pool or part of a pool. *See* NMSA 1978, § 70–7–7 (1986) (providing for the terms to be included in such an order issued by the oil conservation division under the New Mexico Statutory Unitization Act).

## A

{21} In this area of the law, terminology may seem more of a barrier to understanding than it actually needs to be. In the mid–1950s, the term "pooling" referred to "small units," usually of the one well-drilling unit variety, and the term "unitization" referred to "units covering large land areas, particularly the fieldwide or poolwide unit." Hoffman, *supra,* at 6. Nevertheless, the relevant legal principles generally related "to any type of voluntary combination or consolidation of ownership interests for development and production purposes, regardless of the size of the area that may be involved." *Id.* at 7. Today, the terms are used to refer to different procedures. *See Amoco Prod. Co. v. Heimann,* 904 F.2d 1405, 1410 n. 3 (10th Cir.1990) (describing "pooling" as referring to "the combination of several small tracts of land to meet the spacing requirements for a single well" and "unitization" as referring "to fieldwide or partial fieldwide operation of a producing reservoir involving multiple adjoining land tracts"). The terms are described as having different, but related, purposes. The purpose of pooling is to create "sufficient acreage to receive a well drilling permit under the relevant state or local spacing laws and regulations." 1 Bruce M. Kramer & Patrick H. Martin, *The Law of Pooling and Unitization* § 1.02, at 1–3 (3d

ed.2003). "The objective of unitization is to provide for the unified development and operation of an entire geologic prospect or producing reservoir so that exploration, drilling and production can proceed in the most efficient and economical manner by one operator." 2 Cox, *supra,* § 18.02[1], at 18–5. In adopting the New Mexico Statutory Unitization Act, for example, the Legislature indicated an intent to facilitate maximum recovery, to prevent waste, and to protect the respective rights of the affected mineral owners. *See* NMSA 1978, § 70–7–1 (1975).

{22} "Communitization is the federal equivalent of the term pooling, meaning the combination of small tracts so that sufficient acreage is controlled in order to meet the minimum well-spacing requirements." 1 Kramer & Martin, *supra,* § 16.01, at 16–6.1. "The objective of communitization is to provide for the development of separate tracts which could not be independently developed or operated in conformity with well spacing patterns established in the area or by order of the state regulatory agency." 2 Cox, *supra,* § 18.02[1], at 18–5. The 1992 Communitization Agreement to which Amoco is a party notes that "the parties to the agreement own working, royalty or other leasehold interests, or operating rights under the oil and gas leases and lands subject to this agreement which cannot be independently developed and operated in conformity with the well-spacing program established for the field or area." The agreement also notes that it was entered into under the Mineral Leasing Act, which "authorizes communitization or drilling agreements communitizing or pooling a Federal oil and gas lease, or any portion thereof, with other lands, whether or not owned by the United States." *Id. See* 30 U.S.C. § 226(m) (2000) (as amended in 1954 and codified in 1987). The agreement was approved on behalf of the Secretary of the Interior and recorded in San Juan County in 1994.

{23} Given the similar purposes of communitization, or pooling, and unitization, and of the federal and state statutes enacted to facilitate these purposes, we believe that we should analyze the 1992 Communitization Agreement as an agreement that pooled sev-

eral small tracts for purposes of joint operation as a unit. An agreement to pool several small tracts for purposes of joint operation is intended "to prevent the physical and economic waste that accompanies the drilling of unnecessary wells" and "to protect the correlative rights of landowners over a reservoir." 6 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 901, at 3 (2003). The smaller tracts that have been made subject to a unitization agreement are "operated as a single entity, without regard to surface boundary lines." *Id.; accord* 2 Cox, *supra,* § 18.02[2], at 18–13. Consequently, the case law developing principles for either communitized, or pooled tracts, or for unitized tracts are relevant in answering the certified questions.

## B

{24} In arguing their positions, the parties rely initially on general principles of oil and gas law. Amoco relies on the general principle of oil and gas law that when an oil and gas lease grants to the lessee a particular tract of land for the purpose of exploring, drilling, mining and producing oil and gas, the lessee gains by implication the right to enter upon and use as much of the surface as may be necessary for the lessee's operations. 1 Earl A. Brown, *The Law of Oil and Gas Leases,* § 3.06, at 3–45 to –51 (2d ed.2003). The basis for this rule is that " 'when a thing is granted all the means to obtain it and all the fruits and effects of it are also granted.' " *Id.* at 3–51 (quoting *Squires v. Lafferty,* 95 W.Va. 307, 121 S.E. 90, 91 (1924)). New Mexico case law is consistent with this principle. *See Carter Farms,* 103 N.M. at 119, 703 P.2d at 896 (noting that a mineral lessee "is entitled to use as much of the surface area as is reasonably necessary for its drilling and production operations").

{25} The Restatement (Third) of Prop.: Servitudes § 2.15 (2000) characterizes the rights of a mineral owner, when those rights have been severed from the surface, as implied servitudes, or easements, "created by necessity." It seems appropriate to characterize the implied right of the lessee to which *Carter Farms* refers as an implied easement by necessity. *See* Restatement of Prop., § 2.15 cmt. b ("For analytical purposes, implied rights necessary to reasonable enjoyment of profits are treated as implied servitudes covered by the rule stated in this section.")

{26} The Kysars rely on the principle that this implied right generally has been limited to use of the surface of the premises under which the mineral estate lies. "[W]here a person purchases the oil and mineral rights in a specific tract of land, the surface area of such lands may be subjected only to such burdens as are reasonably necessary to the full enjoyment of the mineral estate in such particular specific parcels and the surface area may not be burdened by installations or surface fixtures designed to serve oil producing facilities located without the parcels." *Wall v. Shell Oil Co.* 209 Cal. App.2d 504, 25 Cal.Rptr. 908, 913 (1962). A lessee that holds the right to exploit the minerals underlying a tract of land generally "will not be permitted to use the surface thereof in aid of mining operations on adjacent, adjoining, or other tracts of land." Annotation, *Right of Owner of Title to or Interest in Minerals Under One Tract to Use Surface, or Underground Passages, in Connection with Mining Other Tract,* 83 A.L.R.2d 665, 670 (1962). New Mexico cases also are consistent with this principle. *See Sims,* 97 N.M. at 326, 639 P.2d at 1180 (concluding that the lessee had "an easement . . . for ingress to and egress from that tract for the purpose of developing the underlying oil and gas mineral rights only"); *cf. Rio Costilla,* 81 N.M. at 359, 467 P.2d at 25 (stating that "one who has an easement to enter on land for a particular purpose, and who employs his limited right of entry to occupancy for another purpose, becomes a trespasser while carrying out such other purpose"); *accord* Restatement of Prop., *supra,* § 4.11 cmt. b ("[U]nless otherwise provided an appurtenant easement [or profit] cannot be used to serve property other than the dominant estate.").

{27} In addition to these general principles, we must consider the specific principles developed in the context of pooling, unitization, and communitization. Absent consent and lease provisions that take into account

the possibility of an agreement to pool small tracts for purposes of joint operation, difficult questions arise about the effect of pooling and unitization on a variety of standard lease provisions. *See generally* 6 Williams & Meyers, *supra*, § 950 (discussing the effect of pooling and unitization upon oil and gas leases). "The most frequently litigated issues regarding pooling and unitization relate to the effects of the inclusion of a tract of land, or a portion of the tract, in a unit upon the express and implied terms of an oil and gas lease." 2 Kramer & Martin, *supra*, § 20.01, at 20–3. For example, a rental payment or production may be required by the terms of an oil or gas lease to keep that lease in force on land that is subject to a communitization or unitization agreement. If oil or gas is produced within the unit, but not on the land subject to that lease, a question arises: does that production satisfy the terms of the lease on land subject to the agreement but not the place of production? It seems to be well-established that the appropriate answer is "yes" in certain fact patterns. *See* 6 Williams & Meyers, *supra*, § 952, at 708; *see also* 2 Kramer & Martin, *supra*, § 901, at 9–1. ("A principal effect of the pooling or the unitization of a lease in most states is to preserve the entire lease even if only a portion, however small, of the lease is included in the unit."). In other fact patterns, however, the question is more difficult and the answer is less clear. *See* 6 Williams & Meyers, *supra*, § 952, at 708 ("Some difficulty is presented as to the portion of [the land subject to the lease] excluded from the unit."). Amoco has argued that as a result of the 1992 Communitization Agreement it enjoys an implied right of access not only within the unit but also within the Keys leasehold.

{28} The practice of including a clause to make the lessor's intent clear in this and similar situations is common. Such clauses are sometimes referred to as "Pugh clauses." 6 Williams & Meyers, *supra*, § 952, at 708–09; *see also* 1 Kramer & Martin, *supra*, § 9.01, at 9–2. "Express provisions in a lease to limit the effect of inclusion of a portion of the lease in a unit are often referred to as a 'Pugh clause.'" Such a clause takes its name from the lawyer who first

drafted language to clarify the lessor's intent in circumstances where only a portion of the leasehold was included in a unit. *See* 1 Kramer & Martin, *supra*, § 9.01, at 9–2 n. 3. Such clauses are viewed as providing "for a severance of the lease where less than all of the leasehold is included in a single unit, but such severance provisions vary in important respects." 4 Williams & Meyers, *supra*, § 669.14, at 47. "A Pugh clause ... is any lease clause the purpose of which is to divide or segregate the lease into separately maintained parts when a portion of the lease is included in a unit." 1 Kramer & Martin, *supra*, § 9.01, at 9–2. The Certification Order identified the 1992 Communitization Agreement as including a Pugh clause. We agree with the Tenth Circuit Court of Appeals' suggestion that the presence of a Pugh clause is relevant; we believe it is relevant in answering the second certified question.

### C

{29} With these principles in mind, we now turn to the first certified question. The Tenth Circuit has stated that "[u]nder a communitization agreement, drilling operations conducted anywhere within the unit area are deemed to occur on each lease *within the communitized area* and production anywhere within the unit is considered to be produced from each tract *within the unit.*" *Cheyenne–Arapaho Tribes*, 966 F.2d at 585 (citing *Kenai Oil & Gas*, 671 F.2d at 384) (emphasis added). Furthermore, the Mineral Leasing Act, 30 U.S.C. § 226(m) specifically provides that "operations or production pursuant to [a communitization or drilling agreement] shall be deemed to be operations or production as to each such lease committed thereto." Finally, New Mexico appears to have provided for a similar rule under our Statutory Unitization Act. *See* NMSA 1978, § 70–7–12 (1977) ("All operations, including but not limited to, the commencement, drilling or operation of a well upon any portion of the unit area shall be deemed for all purposes the conduct of such operations upon each separately owned tract in the unit area by the several owners thereof."). The 1992 Communitization Agreement contains similar language.

{30} If operations and production conducted anywhere within the unit are deemed to take place on all leased property within the communitized area, then it appears that as a consequence of a legal fiction, production anywhere within a unit is treated for important purposes as if that production actually had occurred everywhere within the unit. The fiction arises from the purposes served by pooling and unitization. One court describes the relationship between the fiction and the purposes served by pooling and unitization in this way:

> Pooling recognizes that oil and gas found at so-called deep strata is so situated that one well may efficiently drain a rather large area of land, and that the establishment of drilling units may permit the sharing of resources and prevent the waste of requiring each tract owner to drill a well in order to enjoy his or her minerals. A natural correlative notion to unitization or pooling is that minerals are being produced from under each separate surface tract of land included in a drilling unit regardless of whether a well is actually drilled on every tract or not.

*Miller v. N.R.M. Petroleum Corp.*, 570 F.Supp. 28, 30 (D.C.W.Va.1983) (citation omitted). The fiction then might be relied upon to conclude that any leased property that has been committed to a new production unit will be subject to a mineral lessee's implied surface right of reasonable ingress and egress to retrieve minerals produced anywhere within the same unit. The district court articulated this rationale in holding that Amoco enjoyed a right of access to the Sullivan E Well over all of the surface area subject to the communitization agreement.

{31} A number of cases from a variety of jurisdictions support the district court's holding. *See generally* 2 Kramer & Martin, *supra*, § 20.06[1] (discussing surface and subsurface rights of a unit operator in compulsory or voluntary units). For example, in *Property Owners of Leisure Land*, the Texas Court of Appeals stated that "[t]he owner of the severed mineral estate and its lessee have the right to use the surface to the extent that is reasonably necessary to develop and produce the minerals [and][t]his implied surface easement of reasonable usage *extends to the surface of the pooled or unitized area.*" 786 S.W.2d at 760 (internal citations omitted) (emphasis added); *see also Delhi Gas Pipeline Corp. v. Dixon*, 737 S.W.2d 96, 97–98 (Tex.App.1987); *accord Nelson v. Texaco Inc.*, 525 P.2d 1263, 1266 (Okla.Ct.App.1974).

{32} Some courts have emphasized legislative intent. *See, e.g., Deese*, 153 So.2d at 618. In *Deese*, the Alabama Supreme Court relied on the Alabama pooling statute, which provided in part that "[t]he portion of the production allocated to the owner of each tract included in an integrated or pooled unit formed by an integration or pooling order shall, when produced, be considered as if it had been produced from such tract by a well drilled thereon." *Id.* (quotation marks and quoted authority omitted). The court concluded that the lessee had the right to use the surface of all the lots within the unit in a manner reasonably necessary to recover the oil located within the same unit. *Id.* at 619. In applying West Virginia law, a federal district court observed that "[i]t seems only reasonable that the surface area of each tract in a pool should be available for use in connection with the construction and operation of a well, as long as the use is reasonably necessary." *Miller*, 570 F.Supp. at 30. In *Miller*, the district court also considered the intent of the state legislature in enacting legislation "designed to require notice of drilling activities to surface landowners and impose reclamation duties upon operators." *Id.*

{33} At least one court has been able to resolve an issue similar to the one presented by the first certified question by relying on language within the agreement, as well as the purposes of the Legislature in adopting a unitization statute. *See Nelson*, 525 P.2d at 1265 (relying on language in the Unit Plan that provided in part "all leasehold estates included therein, are pooled and unitized 'all to the same extent as if the Unit Area had been included in a single lease and all rights thereunder owned by the Lessees in undivided interests' "). In *Nelson*, the Oklahoma Court of Appeals held that under the Unit Plan:

"[T]he Unit Operator [had] the right to use any surface within the unit for the purpose of efficiently carrying out the approved unit plan.... [A] Unit Operator does not have to obtain an easement from the surface owner for its pipe lines and electric lines to be laid or constructed completely across an individual lease within the unit area."

*Id.* at 1266. The surface owner had argued that the lessee could be viewed as having purchased all the leases within the unit, but absent an easement, could not burden the surface of her property for the benefit of other lessees. *Id.* The court observed, however, that if she was right, "the whole intent and purpose of the unitization law could be defeated by one or more recalcitrant surface owners within a unit area." *Id.* (citation omitted).

{34} Units may be created in different ways, including by agreements among the interested parties, by order, and by the exercise of an authority to enter into an agreement given by the lessor to the lessee within the lease. *See generally* 1 Kramer & Martin, *supra,* at 7–2.1. In *Nelson,* 525 P.2d at 1264, for example, the lease included a right to unitize by voluntary agreement. It is unclear, however, whether or not the surface owner created the right or otherwise was bound by the agreement, although it is clear that she owned "some of the oil and gas rights." *Id.* We assume she either was a party to or was otherwise bound by the agreement, because the Oklahoma Court of Appeals emphasized the language of the agreement as well as the Legislature's intent. The Tenth Circuit Court of Appeals has observed that when a mineral lessee enters into a pooling arrangement pursuant to a unilateral power contained in the lease, "the pooling or unitization implemented under such clauses is not voluntary for the lessor." *Heimann,* 904 F.2d at 1411 n. 5. The Tenth Circuit Court of Appeals also has determined that the question of whether pooling is authorized is determined by the provisions of the lease as a whole and by the pooling clause. *Celsius Energy Co. v. Mid Am. Petroleum, Inc.,* 894 F.2d 1238, 1240 (10th Cir. 1990). "The language governs if it is clear and explicit, and does not involve an absurdi-

ty." *Id.* We believe the same principle is relevant in determining the extent of the implied easement Amoco enjoys: the question is what the lease authorized and what right or rights may be implied from that authority.

{35} We conclude that in entering the 1992 Communitization Agreement, Amoco exercised a general authority given by Keys as a result of the 1953 amendment to the 1948 lease to enter a pooling arrangement and that the continued validity of that authority is in the nature of an implied right that Keys reserved when she conveyed the fee in 1956. *See* Restatement of Prop., *supra,* § 2.15 cmt. b ("Although customary usage has often collapsed the rights necessary to enjoyment of a profit into the concept of the profit itself, the implied secondary rights necessary to enjoyment of profits share a common origin with the implied easements by necessity that provide access to surface possessory estates."). Neither the 1953 amendment, the 1992 Communitization Agreement, nor the New Mexico Statutory Unitization Act, however, contain language specific to the first certified question. Rather, we believe we must balance Amoco's property rights, as a mineral lessee having a general power to pool and unitize, with the Kysars' property rights, as Keys' successor.

{36} It has been suggested that judges and lawyers need to be careful, in addressing problems within the law of pooling and unitization, to recognize the novel nature of pooling and unitization agreements. *See* 2 Kramer & Martin, *supra,* § 19.01[1] (discussing the two prevailing approaches to characterizing the nature of the title within a unit). "The soundest approach to the underlying issue is to treat pooling and unitization agreements as a special area of contract law, but clearly note that these contracts grow out of, and affect, property rights." *Id.* § 19.01, at 19–4 to –5. We agree. *See Owens v. Superior Oil Co.,* 105 N.M. 155, 156, 730 P.2d 458, 459 (1986) (" '[T]he primary consideration when construing an oil and gas lease is to give effect to the intention of the parties.' "). We note, however, that the modern law of servitudes seems to be flexible enough

to be helpful in addressing the issues presented by the facts in this case.

{37} "The rationale for implying the conveyance or retention or rights necessary to permit enjoyment of the subject of a conveyance has changed over the centuries." Restatement of Prop., *supra*, § 2.15 cmt. a. The original basis for an easement for necessity appears to have been "[p]ublic policy favoring use and occupation of land." *Id.* Later, the basis changed:

> [R]eflecting their tendency to explain transactions in private contract terms, 19th century judges concluded that ways by necessity arose because of the presumed intent of the parties. The 20th century has brought renewed recognition of the public-policy basis of servitudes by necessity, although the presumed intent of the parties is still the prevailing rationale expressed in the cases.

*Id.* Having assumed that Keys reserved an implied right to authorize pooling, or communitization, and unitization when she conveyed the fee in 1956, and that Amoco acted within that authority in 1992, we are persuaded that it is sensible as a matter of public policy and not inconsistent with New Mexico law to recognize an additional implied right as a result of the power Keys gave Amoco in 1953. *See id.* cmt. b ("Under the rule stated in this section, a servitude will be implied to do whatever is reasonably necessary for the enjoyment of property, if the conveyance would otherwise eliminate the property owner's right to do those things."); *cf.* § 70–7–12 ("The portions of the unit production allocated to a separately owned tract in a unit area shall, when produced, be deemed, for all purposes to have been actually produced from such tract by a well drilled thereon."); *cf.* 30 U.S.C. § 226(m) (containing a similar provision).

{38} When Keys amended the lease in 1953, the law of pooling and unitization was sufficiently well-developed that several different techniques for authorizing agreements to pool for purposes of joint operation existed. *See* Hoffman, *supra*, at 1–2. She employed a standard clause. "Perhaps the most common means by which the one-well drilling or proration unit ... is created ... is

through the use of a pooling clause." *Id.* at 87. She authorized both pooling and unitization. At the time, the Mineral Leasing Act had been amended to provide that production anywhere within a unit would be treated as if production had occurred or is occurring everywhere within the unit. Act of Aug. 8, 1946, ch. 916, § 5, 60 Stat. 953 (codified as amended at 30 U.S.C. § 226(m)). Under these circumstances, an implied easement serves the intent of the parties as well as public policy. We reject the Kysars' argument that Amoco's implied right of surface access does not include the right to use those portions of Section 22 they acquired from Keys to reach the Sullivan E Well. We believe that Keys should be understood to have contemplated such a use when she amended the lease in 1953. *See* Restatement of Prop., *supra*, § 4.11 cmt. b ("Unless the easement or profit was intended to benefit land to be acquired in the future, the easement beneficiary is not entitled to use it to serve land that is subsequently acquired even if no additional use of the easement or burden on the servient estate would ensue.").

{39} In light of the case law and statutory authority for treating the unit as an entirety, without regard to lease boundaries within the unit, and in light of the purposes served by pooling, we believe it is appropriate to recognize that Amoco enjoys an implied easement over the 37 acres included within the unit in order to operate the Sullivan E Well. We hold that under New Mexico law a mineral lessee's implied surface right of reasonable ingress and egress to reach a well located inside the production unit that the lessee is operating pursuant to a pooling arrangement extends across lease boundaries within the unit to the surface of the entire area subject to the arrangement, regardless of where within the unit production is taking place. The fiction on which Amoco has relied is not dispositive. Rather, it illustrates the importance of the public policy that supports recognizing an implied easement.

**D**

{40} Having recognized an implied right to surface access to the well within the area subject to the agreement, we must de-

cide whether the reasons that support recognizing that right also support recognizing an expansion of that right. We conclude they do not. In making this decision, we have considered the terms of the Keys lease as amended in 1953, as well as the terms of the 1992 agreement. In answering the second certified question, the fiction that production anywhere within the unit is deemed to be production from every tract within the unit seems to us to have little significance. In answering the second certified question, we have an indication of intent within the amended lease that is dispositive.

{41} The concept of "divisibility" of a lease for purposes of determining the effect of communitization or unitization on standard lease provisions is helpful in understanding the amended lease. The concept of divisibility has been employed in explaining the effect of various lease provisions:

> It is true that parties to a lease containing a pooling clause or to a pooling or unitization agreement may agree that the lease shall be indivisible and that production on a unit which includes a part of the leasehold shall suffice to extend the term of the lease as to the excluded acreage. Such an intent is not lightly to be inferred. *It is important to examine carefully the language in the instrument alleged to have this effect and to apply to such language the normal constructional preference for the lessor. In drafting such instruments, the parties should carefully negotiate on this matter and include in the lease language sufficiently explicit to remove all uncertainty as to their intent* [for situations in which the effect of activity within the unit on land outside the unit might be at issue].

6 Williams & Meyers, *supra,* § 957, at 753 (emphasis added). While in that treatise the authors specifically discuss the extension of a lease term, we believe the concept described above is also applicable to the decision Amoco asks us to reach: whether a mineral lessee's implied right of reasonable surface usage within a production unit extends to land outside the unit as a matter of law. The Mineral Leasing Act contains language that suggests the use of the concept of divisibility

has been considered appropriate for some purposes in managing federal leases:

> Any lease heretofore or hereafter committed to any such plan embracing lands that are in part within and in part outside of the area covered by any such plan *shall be segregated into separate leases as to the lands committed and the lands not committed* as of the effective date of unitization [except as hereinafter provided].

30 U.S.C. § 226(m) (emphasis added). Our opinion in *Hickman v. Mylander,* 68 N.M. 340, 362 P.2d 500 (1961), also illustrates the concept of divisibility. In *Hickman,* we held that the Commissioner of Public Lands could extend the term of oil and gas leases only as to land included within a production unit, although the unit agreement provided that the leases should be modified to conform to the provisions of the agreement. *Id.* at 344–45, 362 P.2d at 503 (limiting the extent to which a unit agreement impliedly modified leases of land "only [to] those portions of leases . . . included within the unit area").

{42} We note that the policy arguments against treating leases as indivisible for purposes of holding the lease seem equally relevant in considering the extent of an implied right of access. It has been said that public policy supports divisibility: "Public policy of preventing physical and economic waste and encouraging exploration would be better served by finding leases divisible when a portion of the leasehold is excluded from a unit." 6 Williams & Meyers, *supra,* § 957, at 753. That is because the lessor may derive little or no benefit from the lease on the land excluded from the unit as a result of activity on land within the unit, while "[t]he lessee, on the other hand, is able to retain the excluded acreage for speculative purposes without operations thereon and without making any payment for retaining the excluded land." *Id.* § 957, at 752.

{43} A clause in the 1953 Keys lease amendment provided that communitization "shall not have the effect of continuing this lease in force insofar as it covers the land not included within such unit." That clause appears to indicate an intent, as is true of those clauses identified in the treatises as "Pugh clauses," to limit the effects of communitiza-

tion or pooling. *See generally* 1 Kramer & Martin, *supra,* § 9.01 (discussing the purpose and effect of Pugh clauses). We think that intent is important, because the implied easement we have held Amoco enjoys within the unit is justified to the extent it serves the intent of the parties and advances public policy. *See* Restatement of Prop., *supra,* § 2.15 cmt. a. We note that permitting production anywhere within the unit to preserve the entire lease, when only a small portion of the lease is included in the unit, may not be advantageous to a lessor. *See* 1 Kramer & Martin, *supra,* § 9.01, at 9–1 (discussing the reasons why, whether the producing well is on the lessor's land or not, permitting production anywhere within the unit to hold the entire lease may be disadvantageous to the lessor).

{44} The Keys lease as amended contains another indication of an intent that communitization, although authorized without the need for further consent, would be limited. "Each such drilling or production unit shall not exceed 320 acres ... [and] *no unit shall be created which covers and includes land in more than one Section.*" (Emphasis added.) In 1992, when communitization took place, Amoco, as unit operator, complied with this limitation by establishing a production unit confined to Section 22. If, pursuant to the lease, a unit was to be limited to a single section, we believe the parties to the lease probably intended that the effects of creating a unit, including the recognition of an implied right of surface access, would be confined to the one section subject to the agreement.

{45} Finally, because Keys reserved the mineral rights, the communitization agreement does not benefit the present owner of the surface, and the Kysars did not sign the agreement nor consent to it. In *Carrigan v. Exxon Co. U.S.A.,* 877 F.2d 1237, 1242 (5th Cir.1989), the court noted that when the terms of a communitization agreement conflict with a lease, the agreement implicitly modifies the lease terms. However, the court also concluded that the terms of the lease were modified by the later communitization agreement *"[b]ecause [when] the [present surface owners' and successor lessors'] predecessors in interest signed the*

*Unitization Agreement* in their capacities as owners of land, they may have, *by signing that agreement,* abrogated some of the rights in the surface they had held under the earlier leases." *Id.* (emphasis added). Therefore, while the terms of a communitization agreement that conflict with a lease may implicitly modify the lease terms, such modification is predicated on the intent of the parties as evidenced by their original consent or later ratification of the modifying document. *See id.; Wolff,* 736 P.2d at 732–33.

{46} The Restatement of Property recognizes an implied servitude, or an easement created by necessity, "unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights." Restatement of Property, *supra,* § 2.15. The Pugh clause included by Keys within the 1953 lease amendment is a clear indication that she intended to reject an expansive application of the fiction that production anywhere within the unit was the equivalent of production at every location within the unit. In limiting the power to pool and unitize without further consent, she also indicated an intent to limit the effects of communitization. Under these circumstances, we conclude that it would not be appropriate under New Mexico law to recognize the expanded implied right for which Amoco has argued. We note that the cases on which Amoco has relied were decided after the lease was amended in 1953 and after Keys conveyed the property, reserving the mineral rights.

{47} A "lessee has no power to affect his contractual duties to the lessor under the lease by pooling or unitization absent consent by the lessor, estoppel, or compulsory process under a valid state statute." 6 Williams & Meyers, *supra,* § 950, at 706.1. The cases on which the parties have relied indicate that on these facts the right for which Amoco has argued ought to arise from an express agreement. In *Acree,* for example, the court was asked to determine whether an oil company had a contractual right under an oil and gas lease to lay a pipeline across the surface owners' property. 548 F.Supp. at 1151. The surface owners filed suit alleging that they had been damaged due to a trespass on their

property by the defendants who over their objections "excavated a trench for the purposes of installing a pipeline to be used in the transportation of gas and other petroleum products" across plaintiffs' property. *Id.* In *Acree,* a portion of the plaintiffs' land had been pooled with the adjoining land containing the well site. *Id.* at 1154. The oil company relied on the terms of its lease. *Id.*

{48} The relevant lease read, in part, as follows: "Lessor . . . hereby leases and lets unto Lessee . . . the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads, pipelines and/or canals thereon for operations hereunder *or in connection with similar operations on adjoining land . . . ." Id.* at 1153. Based on this language and other language in other leases held by the oil company in *Acree,* the court concluded that the oil company was entitled to a construction of the leases as a whole and that "even though only part of the lease is retained by virtue of production from a unit, the lessee may exercise rights of way over the nonunitized portion of the lease which may be necessary for its operations on the unitized part." *Id.* at 1155. The court held "the entire surface of the leased tract may be used for the transportation of minerals produced on a unit which includes any part of the lease." *Id.*

{49} In *Wolff,* the lessor sought a judicial declaration that the lessees' oil and gas leasehold interests had expired. 736 P.2d at 731. The issue before the Wyoming Supreme Court on appeal was whether, "under the terms of the oil and gas lease and a subsequent communitization agreement," production on the communitized portion of the leased land kept the entire lease in force. *Id.* The lessor's predecessor-in-interest had leased approximately 803 acres of land to the appellees' predecessor-in-interest. *Id.* The lease contained a clause providing that it should remain in force for ten years, "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee, its successors and assigns." *Id.* The lessor and his predecessor-in-interest subsequently executed a communitization agreement that pooled 40 of the 803 leased acres

with 40 acres of federal mineral land. *Id.* As in the present case, commercial production in *Wolff* was obtained from a well located on the federal portion of the area subject to the agreement, and the lessor received royalties from the production. *Id.* at 732. When the ten-year term expired, the lessor sued to quiet title to the portion of the leasehold not subject to the agreement, arguing that "production on the communitized area should not be considered to be production on the [noncommunitized] remainder of the leased acreage and therefore, with respect to that remaining acreage, the lease had expired." *Id.* The Wyoming Supreme Court, however, reasoned that "[t]he written terms of the *contract* [which included the communitization agreement] constitute[d] a clear and unambiguous *expression of the parties' intent* that production on the communitized area would hold the entire leased acreage." *Id.* at 733 (emphasis added).

{50} Both *Acree* and *Wolff* indicate that the intent of the parties, as expressed in the oil and gas lease, control the contractual obligations of the parties. Likewise, Amoco's right to use either the Bridge Road or the Back Gate Road to develop and service a well outside the leased property must derive from the express intent of the parties. If Amoco is to use those roads, the parties must negotiate an agreement to do so. Such an agreement may define the scope and limits of an easement, as well as the consideration for use of the road and possible present and future maintenance.

{51} The necessity of such an agreement also responds to Amoco's claim that even if no right to use the Kysar roads existed pursuant to the 1953 agreement, the 1992 Communitization Agreement effectively modifies this restriction. In New Mexico, "[a]ll conveyances of real estate *shall be subscribed* by the person transferring his title or interest in said real estate, or by his legal agent or attorney." NMSA 1978, § 47-1-5 (Laws 1851–52) (emphasis added). In *Cox v. Hanlen,* 1998–NMCA–015, ¶ 26, 124 N.M. 529, 953 P.2d 294, the Court of Appeals noted that an easement is a real property interest, and, as such, its unwritten grant "is unenforceable unless one of the exceptions to the statute of

frauds applies." Additionally, in *Ritter–Walker Co. v. Bell,* 46 N.M. 125, 126 123 P.2d 381, 382 (1942), this Court affirmed that "[t]itle to an easement passes like title to any other real estate and the statute of frauds requires that a grant of an easement be in writing unless acquired by adverse user." A conveyance of a right of surface access or easement constitutes a conveyance of real estate which, under New Mexico law, "shall be subscribed by the person transferring his title or interest in said real estate." § 47–1–5. Since neither the Kysars nor Keys "subscribed" the 1992 Communitization Agreement and because we do not think it is appropriate under New Mexico law to recognize an expanded implied right of access as Amoco has argued, we conclude that the 1992 Communitization Agreement did not modify the 1953 lease amendment. We therefore answer the second certified question "no." Amoco does not enjoy an implied right of access by virtue of the communitization agreement over the portion of the Kysars ranch acquired from Keys within Sections 27 and 28.

### III

{52} We conclude that Amoco's reliance on the 1992 Communitization Agreement is misplaced. Amoco enjoys an implied right of access by virtue of that agreement only within those portions of the Kysars ranch that are subject to the agreement. We hold that Amoco is not entitled by virtue of that agreement to use the Bridge Road or the portions of the Back Gate Road that cross the land the Kysars obtained from Keys to access the Sullivan E Well. Our answers on the questions certified to this Court are as follows: (1) on the first question, we conclude that a mineral rights lessee, by virtue of a communitization agreement the lessee was authorized to execute by a prior owner of the fee, enjoys a right of access over the surface estate of the portion of the leased area subject to the agreement, although the lessee did not expressly grant this right; and (2) on the second question, we conclude that a mineral rights lessee, by virtue of a communitization agreement the lessee was authorized to execute by a prior owner of the fee, does not enjoy a right of access over the surface estate of the portion of the leased area not subject to the agreement when the lease did not expressly grant this right.

{53} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA, RICHARD C. BOSSON, and EDWARD L. CHÁVEZ, Justices.